## M. V. Jenkins v. United States

**No. 6090.**—Invoices dated Vancouver, B. C., Canada, September 5, 1941, etc. Entered at Sumas, Wash., September 8, 1941, etc. Entry No. 339–K, etc.

(Decided January 31, 1945)

*Lawrence & Tuttle* (*George R. Tuttle* of counsel) for the plaintiff.

*Paul P. Rao*, Assistant Attorney General (*Richard E. FitzGibbon* and *Daniel I. Auster*, special attorneys), for the defendant.

Cole, Judge: In these cases, plaintiff has appealed for a reappraisement of shipments of firebrick exported by Clayburn Co.,

Ltd., of Vancouver, British Columbia, and entered at the port of Sumas, Wash. The product was in different forms, variously described on the invoices as "Squares," "Squares #10–13," "Side Arch #1," "Side Arch #2." The entered and appraised values of each are set forth in the following tabulation:

| Reappraisement | Merchandise | Entered value U. S. $ per M | Appraised value Canadian $ per M |
|---|---|---|---|
| 150520–A | Squares | $50.00 | $70.00 plus 8% sales tax |
| 150521–A | Squares | 44.00 | 66.00 plus 8% sales tax |
| | Squares #10–13 | 55.00 | 62.50 plus 8% sales tax |
| | Side Arch #1 | 45.00 | 66.00 plus 8% sales tax |
| | Side Arch #2 | 45.00 | 66.00 plus 8% sales tax |
| | | plus $20.65 to make market value | |
| 150522–A | Squares | $47.05 | $66.00 |
| | Side Arch #1 | 47.86 | 66.00 |

The merchandise covered by the three cases was exported on September 8, 1941, June 16, 1941, and January 13, 1941, respectively. The sales tax referred to did not apply until April 29, 1941. Hence the omission of that item in the appraiser's finding in Reappraisement 150522–A.

The appraiser testified that foreign value, section 402 (c) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938 (19 U. S. C. 1940 ed. § 1402 (c)),[1] was the basis for his appraisement and that the values reported are f. o. b. Vancouver, B. C., prices.

Plaintiff contends that the following invoice base prices are representative of statutory dutiable value.

| Reappraisement | Invoice description | Vancouver Price Can. $ per M less 10% | U. S. Price U. S. $ |
|---|---|---|---|
| 150520–A | Firebrick Squares | 61.00 | 50.00 |
| 150521–A | Firebrick Squares | 57.50 | 44.00 |
| | Firebrick Squares #10–13 (Coolers) | 57.50 | 55.00 |
| | Firebrick Side Arch #1 | 58.50 | 45.00 |
| | Firebrick Side Arch #2 | 58.50 | 45.00 |
| 150522–A | Firebrick Squares | 57.50 | 46.50 |
| | Side Arch #1 | 58.50 | 46.50 |

The Vancouver prices are claimed to be the dutiable foreign values, section 402 (c) as amended, *supra*; the United States prices are claimed to be dutiable export values, section 402 (d) of the Tariff Act of 1930

[1] § 1402 (c) Foreign value.

The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale for home consumption to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

(19 U. S. C. 1940 ed. § 1402 (d)),[2] if I found no statutory foreign value existing for the instant merchandise.

Although a 10 per centum discount is mentioned with the invoice (Vancouver) prices and the record contains testimony concerning various discounts allowed different classes of purchasers, the discussion herein will give no consideration thereto. The lack of proof from which to determine the applicability of any particular rate is conceded by plaintiff's counsel in this statement from their brief:

* * * counsel has in mind the fact that discounts were granted in regard to many sales. However, as the record is silent as to whether the major portion of Clayburn's sales in the usual wholesale quantity were subject to a discount * * *, no argument will be now made that the foreign value should include the discount.

The Canadian exporter's managing director with 20 years' experience and whose duties include price fixing as well as sales supervision described the course of business followed by his company. His testimony supports the following summation: Clayburn Co., Ltd., has its office at Vancouver, B. C., with a factory, where the firebrick products in question are manufactured, at Kilgard, B. C., approximately 50 miles from Vancouver. Kilgard is without a railroad connection so all merchandise shipped therefrom is sent by truck. Shipments by railroad are taken by truck to a "rail head," Abbotsford, B. C., about 5 miles distant, where the merchandise is loaded on cars and shipped to its destination. The firebrick products of the Clayburn Co. are superior in quality to those manufactured by other firms in Canada. Except for sales to small retailers (characterized as retail sales and therefore not to be considered here), who purchase in comparatively small quantities, "anything from ten brick to several hundred brick," all transactions of the manufacturer in the Canadian market are in wholesale quantities and without variation as to prices for the particular wholesale quantity purchased. Hence the question of usual wholesale quantity is not before me. *Jenkins* v. *United States*, 25 C. C. P. A. 90, T. D. 49093.

Sales by the manufacturer are generally made to builders' supplies dealers or merchants. But if an order is received from a so-called consumer (pulp mill, saw mill, or foundry), it is accepted and upon delivery a commission is credited to the dealer considered to be entitled thereto. The testimony in this connection is quoted:

Q. Now, you referred to different types of sales yesterday. You will probably recall them, Mr. Roaf, and I want to ask you whether if in addition to those

[2] § 1402 (d) Export value.

The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

sales you made any sales to so-called consumers as to which you allowed a commission to any other person?—A. Yes, we did.

Q. And describe those transactions, please.—A. Any dealer or merchant we sell to, I am speaking of the building supply merchants, who would hand us an order for shipment to a concern, would receive a commission for having negotiated that sale. Is that the answer?

Q. Yes, that is the answer. Is that the only instance, or does that represent the only type of instance?—A. That is our general practice.

Q. Did you also, Mr. Roaf, make sales yourself to consumers and give to some dealer any sum of money?—A. We would accept orders. We do not go out and solicit orders. We would accept orders and after the sale has been made we would credit a merchant or dealer with the commission that we considered he was entitled to.

The foregoing testimony clearly shows that the manufacturer's transactions with consumers have the legal effect of sales to dealers. I therefore find that, so far as the present issue is concerned, the manufacturer's course of business is confined to dealers.

During the period covered by the importations under consideration, the Clayburn Co. sold merchandise, like that in question, at definite base prices. Prior to August 1, 1941, squares, including the so-called "cooler #10-13" type, sold at $57.50 per thousand, and side arches No. 1 and No. 2 at $58.50 per thousand. Due to increased manufacturing costs, the price of all was advanced, as of August 1, 1941, to $61 per thousand. All prices are Canadian currency, and those mentioned evidently relate to sales throughout British Columbia because the record also shows sales to builders' supply dealers in Calgary and Edmonton at lower prices. This difference, however, becomes wholly immaterial in the light of uncontradicted proof showing that prices to all dealers are either f. o. b. Kilgard or f. o. b. Abbotsford. The oral testimony on this point finds corroboration in the manufacturer's catalog (plaintiff's exhibit 6) as follows:

The Clayburn Company's plant is located at Kilgard, British Columbia, and quotations, unless otherwise specified, are on the basis of our yard at that point. For carload shipments, by rail, prices are quoted f. o. b. cars, Abbotsford, British Columbia.

The foregoing factual structure supports but one conclusion when the quoted statutory law is applied. This law is peculiarly for tariff purposes, and it is difficult, if not impossible, to find recognized authorities—text and case law—other than the able expressions of this court and the Court of Customs and Patent Appeals, discussing questions similar to those with which I am here concerned. Particularly applicable now is the statutory term "principal market," which is of primary importance at this point; whether it is Kilgard, as claimed by plaintiff, or Vancouver, British Columbia, as found by

the appraiser. Plaintiff's counsel, in their brief, submit this argument:

Although Clayburn's office is in Vancouver its stock of merchandise was at Kilgard, none being kept in Vancouver (R. 79); and when orders were accepted the bricks covered by the order were removed from the stock, which consisted of between 200,000 and 500,000 pieces (R. 79–81). Also, as noted above, all sales were made on an f. o. b. Kilgard or Abbotsford basis.

Upon such facts it should be found that Kilgard was the principal market, rather than Vancouver as found by the appraiser (R. 136), for a "market" is the place of sale rather than the place of delivery (*Goldmark* v. *United States*, 22 C. C. P. A. 358, T. D. 47378 and *United States* v. *Hallet & Carey Co.*, Reap. Dec. 3668); * * *.

Plaintiff also cites in support of its contention *Kokumo Steel & Wire Co.* v. *Republic*, 268 Fed. 917; *Neer* v. *Lang*, 252 Fed. 575; *United States* v. *Chevallier*, 107 Fed. 434; *Hoffman* v. *Gosline*, 172 Fed. 113; *United States* v. *Cline*, 26 Fed. 515; *United States* v. *Andrews*, 207 U. S. 229; and *De Bary* v. *Dunne*, 172 Fed. 940. All of these cases concerned the relationship of parties under contracts for the sale of merchandise. Viewing the situation discussed in each, in the light of the intention of the contracting parties, they are sound and logical, but have no application here because of the peculiar language of the statute, section 402 (c), *supra*, that controls the present issue.

Determination of a principal market for tariff purposes is not dependent on actual sales. Nor are executory agreements necessary to satisfy the law. The statutory definitions of foreign value and export value, hereinabove quoted, are clear that only *offers for sale* need be shown as a basis for appraisement. The rule was stated in *Oceanic Trading Co.* v. *United States*, 21 C. C. P. A. (Customs) 146, T. D. 46478, as follows:

* * * it is sufficient to say that neither foreign nor export value, as defined by subdivisions (c) and (d), respectively, of section 402 of the Tariff Act of 1930 [which is the same as that used in the 1922 act], is limited to the market value or price at which such or similar merchandise is *sold*, but includes the price at which it is *freely offered for sale*. Accordingly, where it has been established that such or similar merchandise was freely offered for sale, as required by the statute, the absence of evidence of actual sales is not of vital consequence.

*United States* v. *T. E. Ash*, 22 C. C. P. A. 395, T. D. 47401, observed that "the section [section 402 (c)], says nothing of *actual sales*," and further stated "If the statute required foreign value to be determined on the basis of actual foreign sales, the question might be a more difficult one, * * * but the statute does not so require and no necessity exists for any adjudication here of the effect of the actual foreign sales upon the question of foreign value."

The record before me is conclusive that the manufacturer's sales to its dealers are exclusively on an f. o. b. basis, either Kilgard, the place of manufacture of these firebrick products, or Abbotsford, a "rail head" 5 miles distant, and while the legal presumption under

"f. o. b." contracts is that the property passes to the buyer at the time of delivery free on board, unless an intention to the contrary—express or implied, but clear—exists, that principle is not applicable here in the light of the judicial pronouncements in the *Oceanic* and *Ash* cases, *supra*.

*United States* v. *Hallet & Carey Co.*, 68 Treas. Dec. 1286, Reap. Dec. 3668, involving the dutiable value of refuse screenings imported at Toledo, Ohio, from Fort William, Ontario, Canada, presented a situation somewhat analogous to the present one, and in finding the principal market, the court said:

> While the evidence shows that all sales for exportation to the United States are at prices f. o. b. Fort William or Port Arthur, Ontario, the plaintiff's own evidence, both oral and documentary, shows conclusively that the actual buying and selling, in most cases at least, take place in Winnipeg, Manitoba, "because of the facilities afforded by the Winnipeg Grain Exchange as a meeting place for the transaction of business."
>
> Under this state of facts we must hold that Winnipeg is the principal market in Canada for the sale of this particular class of merchandise for export to the United States. * * *.

In the present case, all facilities for the manufacturer's transactions in the merchandise in question are at Vancouver. The orders (collective exhibit 7) are directed to Vancouver, and the invoices (collective exhibits 3, 4, and 5) are prepared at the same place. In addition, plaintiff's witness, Roaf, stated "we have our, what you might call administrative offices, where sales are naturally made"—a direct reference to Vancouver. It is reasonable to conclude that all offers and acceptances are effected at Vancouver. Kilgard is merely the location of the manufacturing plant where a stock of thousands of the different items of firebrick is maintained. But there is nothing in the record to indicate in any way that actual buying and selling occurs there. It is true that the quantity covered by any particular sale is not removed from stock until it is loaded on a carrier, and it may well be that title to the buyer does not pass until that time, but these elements of a transaction are relatively unimportant to the present issue. Following the reasoning applied in the *Oceanic, Ash,* and *Hallet & Carey* cases, *supra,* I hold Vancouver, British Columbia, to be the principal market for the products under consideration.

Consideration will now be directed to the prices charged by the manufacturer. In this connection, it is extremely important to emphasize that plaintiff admits of a restriction imposed by the Clayburn Co., Ltd., on the resale of its merchandise by *any* Canadian dealer, requiring the latter to adhere to the manufacturer's base prices when selling merchandise in wholesale quantities f. o. b. Kilgard or

f. o. b. Abbotsford. Plaintiff's counsel in contending that this price control is immaterial to the present controversy argues:

On behalf of plaintiff it is admitted that the above restriction existed, but it is contended that this is immaterial because Clayburn also offered and sold its products to the same dealers without restriction as to use, resale, etc. Therefore the merchandise was, in the language of section 402 (c) "freely offered * * * to all purchasers."

*United States* v. *Richard*, 15 Ct. Cust. Appls. 143, T. D. 42216; *United States* v. *Robinson*, 19 Ct. Cust. Appls. 274, T. D. 45436; *United States* v. *American Glanzstoff Corp.*, 24 C. C. P. A. 35, T. D. 48308; *American Shipping Co.* v. *United States*, 29 C. C. P. A. 250, C. A. D. 198, are cited to support that proposition. The principle followed in each of those cases, however, is not applicable here. In all of them, it appeared of record that preferential treatment, in the matter of price, was accorded certain classes of purchasers who received benefits or privileges not allowed to all purchasers, and in finding dutiable value the court held it to be the price at which all who cared to buy may purchase. The tariff principle invoked is thus expressed in the *American Glanzstoff Corp.* case, *supra:*

* * *. The language of the statute is "freely *offered* for sale." If the offer has coupled with it the restriction that 5 per centum of the purchase price may be cancelled at the discretion of the seller, then the goods are not *freely offered* for sale at the price, less the loyalty discount, to *all* purchasers.

It appears that a member of the syndicate, * * * stated to the Government representative that about 99 per centum of his customers received the "loyalty" discount, thus showing that a part of them do not receive the same.

\* \* \* \* \* , \* \*

We are of opinion, as a matter of law, that the so-called loyalty discount should not have been deducted in fixing foreign and dutiable value.

A comparable situation does not exist in the present case. Here, I find a market in which a price control is exercised. Clayburn Co., Ltd., imposes a restriction in prices at which its merchandise may be resold by building supply dealers, the only class of purchasers to whom the said manufacturer sells. Such a control eliminates from consideration as statutory foreign value the manufacturer's base price, *J. H. Cottman & Co.* v. *United States*, 20 C. C. P. A. 344, T. D. 46114, holding that restrictions imposed upon the resale and disposition of merchandise sold in the foreign market prevent prices at which the phosphate rock there under consideration was sold, from being considered in finding dutiable foreign value. The same conclusion was reached in *United States* v. *Half Moon Mfg. & Trading Co.*, 28 C. C. P. A. 1, C. A. D. 15, under market conditions whereby manufacturers of bottle caps sold to dealers through an agreement which included a provision that the latter would not resell the merchandise below prices specified in the manufacturer's offer. In *United States* v. *Graham &*

*Zenger, Inc.*, 31 C. C. P. A. 131, C. A. D. 262, the court, speaking of a controlled Belgian market in glassware, said:

, The merchandising practice herein set out does not, in our opinion, constitute the kind of trading contemplated by section 402 (c), *supra*, for the reason that it is not a price freely offered to all purchasers. Clearly all purchasers are not freely offered a price for the reason that those who purchase for home consumption are not free to dispose of the property they buy in all markets. The mandate of the Belgian Government which precludes such purchaser from disposing of his glassware for any use save that of home consumption clearly makes the sale conditional. It is a restriction as to use, and therefore the market is controlled, In *J. H. Cottman & Co. v. United States, supra*, this court held that the Congress intended foreign market value to mean conditions which exist in a free, open, unrestricted market where the buying and selling of goods was under normal competitive conditions.

In all of the three cases just cited, the control in the foreign market was found to be complete. In other words, the restriction was imposed by all sellers in wholesale quantities and extended throughout the principal markets. *United States* v. *Heemsoth-Kerner Corp. (Bauer Type Foundry, Inc.)*, 31 C. C. P. A. 75, C. A. D. 252, found the United States market to be controlled where the manufacturer's list prices in the principal market did not apply to purchasers in territories allotted to distributors. Here, again, the control extended throughout the market.

There is a vital distinction between the above-mentioned cases, wherein the question of a controlled market was involved, and the present one. Here, the restriction is imposed by the manufacturer only and extends to but one class of purchasers, thereby limiting the scope of the control which does not go beyond the building supply dealers, the sole class of purchasers from the manufacturer. While the restriction is confined to transactions between the manufacturer and its customers, it is all-forceful and controlling within its sphere, completely nullifying as it does, the manufacturer's base prices as representative of dutiable foreign values.

Because of its limited influence, the price control referred to does not affect sales made according to statutory requirements. And in the present record there is some evidence showing existence of such a market. A combination of firms in British Columbia, known as Evans, Coleman, Evans, and Associates, building supply dealers, are not only exclusive agents in British Columbia for Clayburn Co., Ltd., under the terms of a written agreement (exhibit 6), but also buy outright from the said manufacturer the firebrick products in question. The manager of the building department of the parent company, Evans, Coleman, and Evans, testified that his concern freely offered the merchandise in question in the principal market of Vancouver to three groups of purchasers, i. e., large industrials and dealers who bought in wholesale quantities, and local contractors who purchased in small quantities. The prices to each class varied;

those to large industrials are the same as the values found by the appraiser. The importance of the witness' testimony lies in the support it lends to the f. o. b.. Vancouver unit appraised values, carrying a statutory presumption of correctness, section 501 of the Tariff Act of 1930 (19 U. S. C. 1940 ed. §1501), and which, on the basis of the present record, I find to be the dutiable unit values of the instant merchandise.

This conclusion presents no conflict with the decision of this court in *Bill & Caldwell, Inc.* v. *United States*, Reap. Dec. 5996. In that case, it was found that the manufacturer of men's fur felt hats, known as Borsalino hats, sold the merchandise in the principal market of Alessandria, Italy, to wholesalers and retailers. On sales to retailers a restriction was imposed on resale prices. Importer contended, however, that the market was not controlled because the merchandise was freely offered to one class of purchasers, i. e., wholesalers. In disposing of the controversy, the court said:

It is appellant's contention that sales of these hats to wholesalers in Italy, as shown by the record, are sufficient to meet the requirements of section 402 (c), *supra*, and to render applicable the statutory formula for foreign value. Of course, this contention proceeds upon the assumption that the sales to wholesalers were free and unrestricted, as to which we express no opinion, and that in determining foreign value the court should be concerned only with the sales which are freely made without restriction. As stated by counsel for appellant at the hearing on review:

* * *. In other words, if you have a group of sales which are freely made without any restriction, and if you have another group of sales which are made under restrictions, or under controls, then the sales which are made under control may not be considered. It is just as though we say they did not exist and therefore you have left only the sales which are freely made.

While this is an ingenious argument we are of the opinion that it cannot be sustained without giving the statute a strained interpretation. An examination of section 402 (c), *supra*, discloses a clear congressional intention to predicate foreign value of imported merchandise in part upon the market value or price at which such or similar merchandise "is freely offered for sale to *all* purchasers." [Italics supplied.] There is no suggestion in the words above-quoted that Congress was concerned with those who "purchase freely," as urged by appellant, but rather with a "freely offered" price by the manufacturer or seller to *all* who might wish to purchase in usual wholesale quantities in the ordinary course of trade.

The law is silent as to purchasers who "purchase freely," but is specific in its reference to a "freely offered" price at which *all* purchasers may obtain merchandise in usual wholesale quantities in the ordinary course of trade without restriction.

The distinction between that case and this lies in the extent to which the control applied. There, the exporter or shipper, who was also the manufacturer, sold the hats to both classes of purchasers. Although the price control applied to only one class, i. e., retailers, the manufacturer, who exercised such control, was the sole distributor or seller of the merchandise in wholesale quantities. Here, there are

two distinct classes of sales in wholesale quantities of the firebrick in question; those by the manufacturer to dealers at a controlled price, and sales by dealers to their customers at freely offered prices.

*United States* v. *Robinson & Co.*, 19 C. C. P. A. 274, T. D. 45436, presented a condition analogous to that herein. There, the merchandise consisted of silk tie squares used in the making of neckties. The manufacturers of such and similar tie squares restricted their sales to wholesalers only. The wholesalers resold the merchandise to all who wished to purchase. Both manufacturers and wholesalers sold in wholesale quantities. Because of the restriction exercised by the manufacturers, the court held their price was not representative of dutiable value, and accepted the wholesalers' price, being freely offered to all who cared to buy, as the foreign value of the merchandise. The reasoning in that case fully supports the finding here that a free and open market existed between the dealers and their customers who bought in wholesale quantities.

The sole remaining question concerns the applicability of the Canadian sales tax of 8 per centum which the appraiser added to the unit values in two of the cases under consideration involving transactions that occurred after April 29, 1941, when said tax became effective. The Special War Revenue Act (plaintiff's exhibit 2), under which the addition in question was made, provides that (sec. 86) "there shall be imposed, levied, and collected a consumption or sales tax of eight per cent on the sale price of all goods (a) produced or manufactured in Canada, payable by the producer or manufacturer at the time of the delivery of such goods to the purchaser thereof." The tax, however, is not imposed on all transactions. It does not attach when goods are (sec. 86–2) "sold by a licensed manufacturer to another licensed manufacturer if the goods are partly manufactured goods; or (b) sold by a licensed manufacturer to a licensed wholesaler." So far as the merchandise under consideration is concerned, the said tax does not apply on sales of "fire brick, * * * and other refractory materials for use exclusively in the construction or repair of a furnace, kiln, or other equipment of a manufacturing establishment, and materials to be used or consumed exclusively in the manufacture of such fire brick or refractory materials" (schedule 111, p. 56).

The exceptions referred to are in the nature of privileges or special treatment granted certain purchasers in the Canadian market. Under authorities hereinabove discussed, such transactions cannot be considered for the purposes of appraisement of imported merchandise. It is the price at which all those who cared to buy might purchase that controls in finding dutiable value. *United States* v. *American Glanzstoff Corp.*, *supra*. It is not disputed that the tax is imposed on sales in the Canadian market of the products in question. Such sales come within two categories, i. e., those to unlicensed purchasers, or when

the merchandise is not to be used for a purpose stated in the Canadian law which specifically exempts imposition of the tax. ,Clearly, the item is a sales tax imposed by the Canadian Government on the products in question when consumed in the home market, and under the well-recognized authorities, *United States* v. *Passavant*, 169 U. S. 16, and *Hugo Reisinger (Inc.) et al.* v. *United States*, 20 C. C. P. A. 67, T. D. 45683, it is part of dutiable foreign value, as found by the appraiser.

*Pitcairn* v. *United States*, Reap. Dec. 5976, involving the applicability of a so-called British purchase tax to the dutiable value of imported merchandise and which plaintiff seeks to compare with the present issue, has no bearing here. Not only was a different factual basis presented there, but the law involved differed materially from the one under consideration in this case.

Although plaintiff also claims export value, section 402 (d), *supra*, as a basis for appraisement of the instant merchandise, counsel, in their brief, concede that "as the testimony in regard to export sales does not relate to side arches or to the squares sold after August 1, 1941, such articles as are covered by these appeals cannot be so appraised." Thus the claim for export value is limited to the "squares" exported prior to August 1, 1941, for which plaintiff claims a price of $50 (United States currency) less 10 per centum. The only testimony on this point is a statement by plaintiff's witness, Roaf, that Clayburn Co., Ltd., sold their products to consumers at the said price. There is no showing, however, that such sales were in accordance with the terms of the statute, said section 402 (d). Consequently, the stated price has no evidentiary value in this case.

For reasons hereinabove set forth, I hold foreign value, section 402 (c), *supra*, to be the proper basis for appraisement of the items in question and that the appraised values are representative of such statutory value. Judgment will be rendered accordingly.